IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

| | | |
|---|---|---|
| DEREK L.,[1] | ) | |
|     Plaintiff, | ) | Civil Action No. 3:20-cv-00070 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) |        United States Magistrate Judge |
|     Defendant.[2] | ) | |

Plaintiff Derek L. asks this Court to review the Commissioner of Social Security's final decision denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the applicable law, I cannot find that substantial evidence supports the Commissioner's decision. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted for the former Commissioner, Andrew M. Saul, as the named defendant in this action. *See* 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d).

1

whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

2

or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Derek applied for DIB in January 2018, Administrative Record ("R.") 195–96, ECF No. 10, alleging disability because of type II diabetes mellitus and numbness in his feet, R. 218. He alleged that he became disabled on June 23, 2017. R. 195. He was fifty-two years old, or a "person closely approaching advanced age" under the regulations, on his alleged onset date. R. 77; 20 C.F.R. § 404.1563(d). Disability Determination Services ("DDS"), the state agency, denied his claim initially in May 2018, R. 68–75, and upon reconsideration that June, R. 77–86. In December 2019, Derek appeared with counsel and testified at an administrative hearing before ALJ Brian Rippel. *See* R. 46–67. A vocational expert ("VE") also testified at this hearing. *See* R. 59–66.

ALJ Rippel issued an unfavorable decision on January 9, 2020. *See* R. 26–39. He found that Derek had not engaged in substantial gainful activity since June 23, 2017, his alleged onset date. R. 28. ALJ Rippel then found that prior to February 14, 2019, Derek had the medically determinable impairments ("MDI") of diabetes mellitus, hypertension, loss of vision due to right eye removal, and obesity. *Id.* Nonetheless, he found that Derek "did not have an impairment or combination of impairments that significantly limited (or was expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months," and therefore he did

3

not have a "severe" MDI or combination of MDIs prior to February 14, 2019. *Id.* Accordingly, Derek did not meet the threshold requirements to be found disabled on or before that date. 20 C.F.R. § 404.1520(a)(4)(2) ("If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . , or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled."); *see Bowen v. Yuckert*, 482 U.S. 137, 145 (1987) (noting that "disability claimants [must] make a threshold showing that their 'medically determinable' impairments are severe enough to satisfy the regulatory standards").

After February 14, 2019, however, Derek had "severe" MDIs of diabetes mellitus, hypertension, loss of vision due to right eye removal, obesity, and coronary artery disease status-post myocardial infarction, angioplasty, and stent. R. 31. Those impairments did not meet or medically equal any relevant Listing. R. 32–33 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 2.02, 2.03, 2.04). ALJ Rippel assessed the following RFC for Derek "since" February 2019:

> the claimant . . . has no sitting limitation. He is limited to only occasional postural activities to include climbing ramps or stairs, balancing, stooping, kneeling, or crouching; but, no crawling or climbing ladders, ropes, or scaffolds. He is limited to only minimal exposure to temperature extremes, both hot and cold (minimal defined as 10% or less of workday). He is limited to only occasional exposure to wetness, humidity, respiratory irritants (such as fumes, odors, dust, gases, poorly ventilated areas), or vibrations. He can have no exposure to workplace hazards (including unprotected heights and dangerous machinery). Due to right eye blindness, work should not require peripheral vision to the right. Also, he is limited to only occasional teaks requiring fine depth perception as would be needed for working with items smaller than a typical paperclip.

R. 33. Although this RFC finding did not identify any exertional limitations, *see id.*, ALJ Rippel indicated throughout his decision that he meant to limit Derek to "light work" with additional postural, environmental, and visual restrictions. *See, e.g.*, *id.* ("Light work involves lifting or carrying 20 pounds occasionally and 10 pounds frequently, standing or walking about 6 hours in

4

an 8-hour workday, and sitting about 6 hours in an 8-hour workday."); R. 36 ("The weight of the objective evidence supports a finding that the claimant is capable of performing a limited range of light work."); R. 37 (noting VE's testimony that a person with "the limited light [RFC] described above" could do Derek's past relevant work as "customarily performed" at the "light" exertion level); R. 38 (finding that Derek did not have the RFC to do "the full range of light work," but he could do specific "light, unskilled" occupations existing in the national economy).

Based on this RFC finding and the VE's testimony, ALJ Rippel determined that Derek could have performed his past relevant work as a grocery store assistant manager since February 14, 2019, R. 37, and that there were certain other "light" jobs existing in significant numbers in the national economy that Derek could have performed during that period, R. 37–38, including store clerk, cashier II, and office helper, R. 38 (citing R. 59–66). Thus, the ALJ concluded that Derek was "not disabled" from January 23, 2017, through the date of his decision. R. 39. The Appeals Council declined to review that decision, R. 1–8, and this appeal followed.

### III. Discussion

Derek challenges the ALJ's evaluation of the medical opinion evidence of record in determining that he could perform a range of light work. *See generally* Pl.'s Br. 7–12, ECF No. 12. Specifically, he contends that the ALJ erred in finding the opinions of Kenneth Johnson, M.D., "not persuasive." *Id.* at 7 (citing R. 36, 457–60). He first argues that ALJ Rippel's conclusion that Dr. Johnson's opinion was "not consistent with the provider's treatment records or the other evidence of record[] which show[ed] generally unremarkable examinations" is not supported by substantial evidence because ALJ Rippel did not clearly identify the "treatment notes" or "other evidence" that he found inconsistent with Dr. Johnson's opinion. Next, he argues that ALJ Rippel did not articulate how he considered the "supportability" of Dr.

5

Johnson's opinion before determining that it was "not persuasive," as the regulations required him to do. *Id.*; *see* 20 C.F.R. § 404.1520c(b)(2), (c)(1). Derek's arguments are persuasive. *Cf. Dowling v. Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 386 (4th Cir. 2021) (explaining that the prior version of this regulation, 20 C.F.R. § 404.1527(c), required "ALJs [to] consider each of the enumerated factors before assigning less than controlling weight to a medical opinion from a treating physician," and that remand was necessary where "the ALJ neglected to even acknowledge the existence of those factors, much less engage in a meaningful discussion of them, so as to facilitate judicial review"); *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 661 (4th Cir. 2017) (concluding that a regulation which "states the SSA *will* document application of the [special] technique in the decision" imposed mandatory duty of written explanation in evaluating mental impairments and explaining that an ALJ's "failure to properly document application of the special technique will rarely, if ever, be harmless because such a failure prevents, or at least substantially hinders, judicial review"); *see, e.g.*, *Hardy v. Comm'r of Soc. Sec.*, No. 20-10918, 2021 WL 3702170, at *3–6 (E.D. Mich. Aug. 13, 2021) (published opinion) (concluding that 20 C.F.R. § 404.1520c(b)–(c) creates a "procedural guarantee that an ALJ will explain—will 'articulate'—how persuasive" the ALJ found each medical source's opinions and requires the ALJ to "discuss" or "explain" in writing "how [he or she] considered the supportability and consistency factors" in making that determination, and reversing denial of benefits where ALJ concluded physician's medical opinion was "unpersuasive" because it "lacked support in [her] own contemporaneous treatment [notes] or elsewhere in the extensive record," but ALJ provided "no discussion—no 'articulation'—of the supportability and consistency factors" in his decision) (citing *Dowling*, 986 F.3d at 386).

A.    *Summary*

     *1.*     *Relevant Medical History*

Derek saw Dr. Johnson throughout 2017 and 2018 regarding his type II diabetes. Dr. Johnson's examination findings consistently revealed generally normal results. *See, e.g.*, R. 312, 362, 375, 407, 425, 480, 491. Derek's A1c level fluctuated often over this period, however, as did his reported blood glucose levels. For instance, in January 2017, Derek reported his fasting blood sugar level was typically around 160, his prandial blood sugar level typically ran around 280, R. 334, and his A1c level was 12.9%, R. 337. At a follow up in May 2017, Derek reported that his blood sugar level ranged from 120 to 230 and occasionally went as high as 300, R. 361, and his A1c was "still horrible" at 12.7%, R. 364. Derek reported his blood sugars were "consistently" over 200 in June, R. 374, and his A1c was noted to still be in excess of 12%, R. 377 ("His diabetes is poorly controlled"). Dr. Johnson noted at that time that Derek reported Humalog was the only effective medication for controlling his glucose levels, said he often forgot to, or did not desire to, take his insulin, and said his endocrinologist had recommended an insulin pump, but Derek felt it would be "too cumbersome" for him. R. 374. Dr. Johnson instructed Derek to increase his nightly Lantus dosage by two units until his glucose level went below 200. R. 375. By December, Derek's A1c level had increased to 14%, R. 409, and he reported fasting blood sugars ranging from 110 to 200, R. 406.

In February 2018, Derek reported fasting blood sugars ranging from 168 to 200, R. 424, and Dr. Johnson ordered him to increase his nightly Lantus dosage by one unit until his fasting glucose levels went below 150, R. 425. In July, it was noted that Derek had previously been using his Lantus in the mornings, rather than at night as instructed, and he saw "huge improvement" in his blood sugar level after he had begun using it at night. R. 480. In October, Derek told Dr. Johnson his fasting blood sugar level ran around 100 and his prandial blood sugar

level ran around 200, and he reported experiencing "a few" episodes of hypoglycemia. R. 490; *see also* R. 520 (A1c at 12.2%) (Oct. 24, 2018).

On February 13, 2019, Derek complained to Dr. Johnson of jaw pain starting that day and constant substernal chest pain over the past two days. R. 499. Physical exam findings were normal, but an ECG demonstrated t-wave abnormalities, and Dr. Johnson sent Derek straight to the emergency room for further cardiac evaluation and treatment. R. 500. On February 14, Derek presented to the Emergency Department at Mary Washington Hospital, where he was diagnosed with a myocardial infarction. R. 525. He underwent a diagnostic cardiac catheterization, "which was significant for severe 1 vessel disease." *Id.*; *see also* R. 534. Derek then had a percutaneous coronary intervention. R. 535–36, 547. The attending physician prescribed Brillinta, metoprolol, lisinopril, and rosuvastatin, noted that Derek "needs aggressive risk factor modification including diabetes control," and discharged him in stable condition with follow-up with cardiology and his primary care physician. R. 525, 536.

Derek was readmitted to the hospital on February 20 for elevated blood pressure. *See* R. 501. On February 24, he reported to Dr. Johnson that he was fatigued and that his blood pressures were "now well maintained." *Id.* He reported fasting blood sugar levels around 70 to 80, but he "had some readings as low as 40's, during which he does feel symptomatic." *Id.* He had also been reducing his Lantus dosage "to avoid hypoglycemia at night," and he had not needed to use Humalog since his discharge. *Id.* At a post-surgical follow up in March, Derek reported that he had not experienced any chest pain/angina since his surgery, but he complained of shortness of breath and fatigue, stating that he got more tired than he did before his surgery. R. 554. Examination findings were normal. *Id.* Ashok Prasad, M.D., assessed essential hypertension, non-ST elevation myocardial infraction, atherosclerotic heart disease of native

8

coronary artery without angina pectoris, hyperlipidemia, and type II diabetes mellitus without complication. R. 554–55. He ordered cardiac rehabilitations, continued Derek on his medications, and started a low dose beta-blocker to help with Derek's fatigue. R. 555.

A few days later, Derek saw Vladimir Bakalov, M.D., regarding his diabetes. R. 577–82. Dr. Bakalov noted that Derek's right eye had been removed, R. 577, and his review of systems was positive for fatigue, visual disturbance, lightheadedness, numbness, and tingling, R. 578–79; *see also* R. 609 (noting Derek was completely blind in his right eye from ocular trauma sustained "years ago"). Examination showed a missing right eye, increased abdominal obesity, and a "sensory deficit" in both feet. R. 579–80. Dr. Bakalov instructed Derek to eat fewer carbohydrates and to check his blood sugar four times daily "in order to adjust insulin and prevent hypoglycemia," R. 580, and he prescribed Lantus, Victoza, and Farxiga for "uncontrolled" diabetes and Vitamin B-12 for diabetic sensory polyneuropathy, R. 581–82. Dr. Bakalov noted that Derek's heart condition was managed by cardiology. R. 581. At an April follow-up visit with Dr. Bakalov, review of systems, examination findings, and assessment/plan were unchanged. R. 585–86.

In March 2019, Rachel Farrar, FNP, completed a form titled, "Treating Source Statement–Physical Conditions," R. 457–60, and Dr. Johnson endorsed the last page, R. 460. *See* R. 36 (ALJ attributing the medical opinions to Derek's primary care provider). Dr. Johnson estimated that Derek would be "off task" about twenty percent of the workday and would miss an average of four days of work per month because of fluctuations in Derek's blood sugar level and his need to "frequently" monitor his diabetes. R. 457 ("Estimate depends on fluctuations in blood sugar brittle diabetes requiring frequent monitoring."). Dr. Johnson also found that Derek could "occasionally" lift/carry up to ten pounds, occasionally lift/carry ten to twenty pounds, and

9

never lift/carry fifty or more pounds because of his "recent myocardial infarction and stent placement." R. 458. Derek could stand/walk for two hours and sit for four hours in an eight-hour workday. *Id.* Dr. Johnson attributed these limitations to Derek's fatigue from his myocardial infarction. *Id.* Derek required an "at-will" sit/stand option for when he became hypoglycemic. *See id.* ("If hypoglycemia occurs, he will need to be seated."). He did not need to lie down during the day, but his fatigue limited him to "frequently" using either arm/hand for all reaching, handling, fingering, feeling, and pushing/pulling. R. 459 ("No impairments to arms or hands, but length of time limited due to fatigue."). Derek's diabetic neuropathy limited him to occasionally using foot controls with either foot. *Id.* Derek could occasionally climb stairs and ramps, stoop, kneel, and rotate his head and neck; could rarely balance, crouch, or crawl; and could never climb ladders. R. 460. Dr. Johnson attributed Derek's climbing and balancing limitations to a "fall risk secondary to hypoglycemia" and his other postural limitations to fatigue secondary to his myocardial infarction. *Id.* Derek could tolerate occasional exposure to humidity and wetness, dust/odors/fumes/pulmonary irritants, extreme cold, extreme heat, and vibrations; could rarely work around moving mechanical parts or operate a vehicle; and could never be exposed to unprotected heights. *Id.*

    2.    *Derek's Statements*

Derek testified at an administrative hearing before ALJ Rippel in December 2019. *See* R. 46–67. Derek said he drove "about" three days a week, and he lived with his wife and children. R. 50. His most recent job was as a manager of the dairy department at Giant Food. R. 51. He was terminated "due to [his] disability of diabetes" in June 2017. *Id.* He further explained that the diabetes medication he had been taking caused him to urinate frequently and the day his employment was terminated he was unable to make it to the bathroom and instead urinated in a

10

nearby drain. *Id.* He had applied for one or two other jobs since, but he was unable to find employment because his prior termination had been labeled "misconduct" or something similar. R. 51–52. When asked if he believed he would still be working at Giant had he not been caught urinating in the drain, Derek replied, "probably." R. 52. But, he also explained that his medical condition had deteriorated since his heart attack in February 2019, nearly two years after he stopped working. *See* R. 51, 54–55. Derek experienced tendonitis once or twice a month, and he had tingling sensations in his feet "off and on" throughout the day, *id.*, which usually required him to sit for about twenty minutes, R. 55. Derek was "constantly tired" after his heart attack, experienced dizziness and shortness of breath, and usually needed to sit for about thirty minutes after "doing something heavy or exerting or walking." *Id.* His right eye had been damaged in 2005, and he subsequently underwent surgery to have it removed. R. 56.

When asked how the "housework and yardwork, shopping, cooking, mowing of lawns, et cetera" took place, Derek said it was a "joint effort" with his wife who worked outside the home. R. 57. Derek would help his children get ready for school, but he would "usually take a nap for a couple hours" afterwards because he was exhausted. *Id.* After his nap, he would typically get back up, do a load of laundry, fold it, then take another nap. R. 57–58. He would help his children with the yard work, but he would "go sit down and they'll keep working and then come back and help them again . . . we just try to make it a team effort." R. 58.

B.   *Analysis*

Derek's argument challenges the ALJ's RFC finding that he could perform "light" work with "occasional" postural activities and did not need to be off task during the workday, R. 33. *See* Pl.'s Br. 8–11 (discussing Dr. Johnson's more restrictive limitations on lifting/carrying, sitting, standing/walking, using foot/arm controls, balancing, crouching, and time spent on task)

11

(citing R. 457–58). A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

In determining a claimant's RFC, the ALJ will evaluate the medical opinion evidence of record. For claims filed after March 27, 2017, a "medical opinion" is a statement from a "medical source"[4] about what a claimant can do despite his or her impairments and whether one or more impairments causes limitations or restrictions in the ability to perform physical, mental, and other work demands and to adapt to environmental conditions in the workplace. 20 C.F.R. § 404.1513(a)(2)(i)–(iv). The ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." *Id.* § 404.1520c(a). Instead, the ALJ "will articulate how [he or she] considered the medical opinions and prior administrative medical findings" in the claimant's record "according to paragraph (b)" of the governing

---

[4] A "medical source" is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." 20 C.F.R. § 404.1502(d).

12

regulation, 20 C.F.R. § 404.1520c. Paragraph (b) in turn "promise[s] claimants that ALJs 'will articulate in their determination or decision how persuasive they find all of the medical opinions'" in the case record, *Hardy*, 2021 WL 3702170, at *1 (quoting 20 C.F.R. § 404.1520c(b)), and instructs that "[t]he factors of supportability and consistency are the most important factors [ALJs] consider when they determine how persuasive [they] find a medical source's medical opinion . . . to be," 20 C.F.R. § 404.1520c(b)(2) (citations omitted). "Therefore, [ALJs] *will explain* how [they] considered the supportability *and* consistency factors for a medical source's medical opinions . . . in [the] determination or decision" on the disability claim. 20 C.F.R. § 404.1520c(b)(2) (emphasis added); *see Hardy*, 2021 WL 3702170, at *3 (concluding that § 404.1520c(b) creates "a procedural guarantee that an ALJ will explain—will 'articulate'— how persuasive [he or she] found each medical source . . . . but the regulations only require ALJs to discuss the . . . supportability and consistency" factors, and that "[f]or those two factors, the regulations further pledge that ALJs 'will explain how [they] considered the supportability and consistency factors for a medical source's opinions'" in the written decision) (quoting § 404.1520c(b)); *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 FR 5844-01 (Jan. 18, 2017) (explaining that the final rules in § 404.1520c "require our [ALJs] to consider all of the factors" in § 404.1520c(c) "for all medical opinions and, at a minimum, to articulate how they considered the supportability and consistency factors" in determining persuasiveness) ("*Revisions to Rules*"). Put differently, § 404.1520c(b)–(c) states the "minimum level of articulation" ALJs must include in their written decisions "to provide sufficient rationale for a reviewing . . . court," *Revisions to Rules*, 82 F.R. 5844-01, "to determine whether the ALJ's decision is supported as a matter of fact *and* law," *Keene v. Berryhill*, 732 F. App'x 174, 177 (4th Cir. 2018) (emphasis added). *See Dowling*, 986 F.3d at 386; *Patterson*, 846 F.3d at 662;

13

*Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013) ("A necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. (internal citations omitted)).

"Supportability" means that "[t]he more relevant the objective medical evidence and supporting explanations *presented by a medical source* are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." 20 C.F.R. § 404.1520c(c)(1) (emphasis added). "Consistency," on the other hand, means that "[t]he more consistent a medical opinion(s) . . . is with the *evidence from other* medical sources and nonmedical sources in the [record], the more persuasive the medical opinion(s) . . . will be." *Id.* § 404.1520c(c)(2) (emphasis added). Thus, the ALJ must articulate how he or she considered each of those factors in determining persuasiveness for all medical opinions in the claimant's record. *See Revisions to Rules*, 82 FR 5844-01 ("This articulation *will include* the supportability *and* consistency factors, which generally includes an assessment of the supporting objective medical evidence and other medical evidence, *and* how consistent the medical opinion or prior administrative medical findings [are] with other evidence in the claim." (emphasis added)); *cf. Black & Decker Corp. v. Comm'r*, 986 F.2d 60, 65 (4th Cir. 1993) ("Regulations, like statutes, are interpreted according to canons of construction. Chief among these canons is the mandate that constructions which render regulatory provisions superfluous are to be avoided." (internal quotation marks omitted)). ALJs "may, but are not required to, explain how [they] considered the factors" listed in § 404.1520c(c)(3)–(5), such as the source's medical specialty or treatment relationship with the claimant. *Id.* § 404.1520c(b)(2). *But see id.* § 404.1520c(b)(3) ("When we find that two or more medical opinions . . . about the same issue are both equally well-supported

14

(paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions . . . in your determination or decision.").

ALJ Rippel's decision does not meet this "minimum level of articulation," *Revisions to Rules*, 82 FR 5844-01. ALJ Rippel summarized Dr. Johnson's medical opinions. R. 36. He found Dr. Johnson's opinion was "not persuasive," reasoning that it was "not consistent with this provider's treatment records or the other evidence of record, which shows generally unremarkable examinations apart from [Derek's] weight and some decreased sensation in his feet." *Id.* Further, he found Derek's testimony "that he would probably still be working at Giant if he had not been caught urinating in a drain and that he does household chores, yardwork, and drives 3 days a week" was inconsistent with the limitations identified in Dr. Johnson's opinions. *Id.* ALJ Rippel's explanation touched on the consistency of Dr. Johnson's opinion compared to other broad categories of evidence in the record, R. 36, but he did not address the supportability of Dr. Johnson's opinion. Here, Dr. Johnson explained his medical opinions with reference to Derek's diabetes and heart problems and the limitations that those impairments caused. R. 457–60. The ALJ acknowledged those explanations when summarizing the opinion, R. 36, but he did not articulate any findings as to the supportability of Dr. Johnson's opinion, and as such has not satisfied the regulation's "articulation requirement." *See Hardy*, 2021 WL 3702170, at *3–6 (collecting cases). Accordingly, I find that ALJ Rippel's evaluation of Dr. Johnson's medical opinions was legally deficient.

Moreover, although the ALJ discussed the consistency of Dr. Johnson's opinions and found that they were "not consistent" with Dr. Johnson's own treatments records and the other

15

evidence of record, his discussion of the evidence that supported his conclusion was inadequate. For instance, despite finding that Dr. Johnson's own treatment notes were inconsistent with his opinion, the ALJ offered no citations or examples of the treatment notes demonstrating this purported inconsistency. And, while he also found that Derek's "generally unremarkable examinations apart from [his] weight and some decreased sensation in his feet" were "not consistent" with Dr. Johnson's opinions, he did not identify any specific examinations or specific findings that he found "not consistent" with Dr. Johnson's opinion. *See Roberta M. v. Saul*, No. 7:18cv243, 2019 WL 4786057, at *7 (W.D. Va. Sept. 30, 2019) ("In sum, the lack of reference to specific findings by Dr. Lemmer and to specific parts of the records that are inconsistent with his findings, frustrates meaningful review of the ALJ decision."). In other words, the Court is left to guess about which exam findings and treatment notes the ALJ's conclusion as to the consistency of Dr. Johnson's opinion was based. *See Mascio*, 780 F.3d at 637 ("Because we are left to guess about how the ALJ arrived at his conclusions. . . and indeed, remain uncertain as to what the ALJ intended, remand is necessary.").

In questioning the consistency of Dr. Johnson's opinion, the ALJ also relied on Derek's testimony that he would "probably" still be working at Giant had he not been fired for urinating in drain, did household chores, yardwork, and drove three days a week. R. 36. The ALJ offered no explanation, however, as to how and why this testimony is "not consistent" with Dr. Johnson's opinion, other than merely concluding that "[t]his is not consistent with this level of limitation," *id. See Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) ("[T]he ALJ must *both* identify evidence that supports his conclusion *and* build an accurate and logical bridge from [that] evidence to his conclusion."). Moreover, it is unclear whether the ALJ considered the limited extent to which Derek testified he could perform these activities. *See id.* ("An ALJ may

16

not consider the *type* of activities a claimant can perform without also considering the *extent* to which [he] can perform them."). For instance, although Derek did say that he did household chores and yardwork, he also described needing assistance from his family and taking long breaks while doing so. R. 57 (describing housework and yardwork as a "joint effort" and saying he would usually nap for "a couple of hours" after getting his children ready for school). It remains unclear how Derek's ability to perform these tasks *on that basis* is "not consistent" with the limitations Dr. Johnson identified. "The 'critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as [he] would be by an employer.'" *Tanzi F. v. Saul*, No. 3:19cv167, 2021 WL 3205050, at *6 (E.D. Va. July 8, 2021) (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). If the ALJ considered these "critical differences," he did not explain how they factored into his assessment of the consistency of Dr. Johnson's opinions. *See Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The [ALJ's] casual equating of household work to work in the labor market cannot stand.").

In sum, the ALJ did not address the supportability of Dr. Johnson's opinion, and he offered a legally deficient explanation for his finding that Dr. Johnson's opinion was "not consistent" with his own findings and the other evidence of record. Accordingly, I find that ALJ did not comply with the requirements of 20 C.F.R. § 404.1520c(b)–(c) in evaluating Dr. Johnson's opinion, and thus remand is warranted.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** the Commissioner's Motions for Summary Judgment, ECF No. 14, **REVERSE** the

Commissioner's final decision, **REMAND** the case for further administrative proceedings under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 3, 2022

Joel C. Hoppe
United States Magistrate Judge